Matter of Galarza (2025 NY Slip Op 06318)

Matter of Galarza

2025 NY Slip Op 06318

Decided on November 19, 2025

Appellate Division, Second Department

Per Curiam.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 19, 2025
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

HECTOR D. LASALLE, P.J.
MARK C. DILLON
COLLEEN D. DUFFY
BETSY BARROS
DEBORAH A. DOWLING, JJ.

2023-00071

[*1]In the Matter of Julio Ceasar Galarza, an attorney and counselor-at-law. Grievance Committee for the Tenth Judicial District, petitioner; Julio Ceasar Galarza, respondent. (Attorney Registration No. 2655215)

DISCIPLINARY PROCEEDING instituted by the Grievance Committee for the Tenth Judicial District. The respondent was admitted to the Bar at a term of the Appellate Division of the Supreme Court in the Second Judicial Department on March 15, 1995.

Catherine A. Sheridan, Hauppauge, NY (Rachel Merker of counsel), for petitioner.
Slavin & Slavin (Barton L. Slavin and Scalise & Hamilton, P.C., Scarsdale, NY [Deborah A. Scalise], of counsel), for respondent.

PER CURIAM.

OPINION & ORDER
The Grievance Committee for the Tenth Judicial District commenced a formal disciplinary proceeding against the respondent by serving and filing a notice of petition and a verified petition, both dated December 16, 2022. The respondent served and filed a verified answer dated February 22, 2023, and an amended verified answer dated April 19, 2023. By decision and order on application dated September 26, 2023, this Court, pursuant to 22 NYCRR 1240.8(b)(1), referred the matter to the Honorable Arthur J. Cooperman, as Special Referee, to hear and report. In a report dated May 2, 2024, the Special Referee sustained all five charges in the petition. By notice of motion dated July 12, 2024, the Grievance Committee moves to confirm the report of the Special Referee sustaining all five charges of professional misconduct, to strike paragraph 66 of the respondent's amended answer on the ground that the affirmative defenses therein do not comply with CPLR 3014 and 3018, and to impose such discipline upon the respondent as the Court deems just and proper. The respondent submits an affirmation in opposition asserting that only charge one should be sustained and the remaining four charges should be dismissed, and that branch of the Grievance Committee's motion which is to strike paragraph 66 of the respondent's amended answer on the ground that the affirmative defenses therein do not comply with CPLR 3014 and 3018 should be denied as academic. The respondent requests a sanction no greater than a public censure or an admonition for his misconduct related to charge one.
The Petition
The petition alleges five charges of misconduct surrounding the respondent's representation of JH.
Charges one and two allege that pursuant to a Letter of Engagement/Retainer Agreement (hereinafter the retainer agreement) dated February 15, 2019, JH retained the respondent to represent her in defense of an action in Supreme Court, Nassau County. The action was for specific performance of a contract for the sale of real property in East Meadow owned by JH (hereinafter the property). For this representation, the respondent charged a flat fee of $7,500. The [*2]retainer agreement did not specify hourly rates for legal or nonlegal services.
In or about May 2019, the respondent negotiated a new contract of sale for the property. A closing on the property occurred on May 15, 2019, the underlying action was settled, and the respondent was paid $7,500 in accordance with the retainer agreement. The net proceeds from the sale, totaling $194,186.57, were deposited into an attorney trust account maintained by Elliot Small in an account ending in 3717 at TD Bank, entitled "Elliot S. Small Attorney at Law IOLA Trust Account" (hereinafter Small's escrow account).
Starting in or about July 2019, the respondent represented JH in a matter before the Suffolk County Traffic and Parking Violations Agency (hereinafter the traffic court matter). Starting in or about November 2019, the respondent represented JH in a criminal matter in District Court, Nassau County (hereinafter the criminal court matter). Starting in or about July 2020, the respondent represented JH in a matter before the Mental Health Court Part, Supreme Court, Queens County (hereinafter the Mental Health Court matter). Starting in or about December 2020, the respondent represented JH in a personal injury claim before the New York State Court of Claims (hereinafter the Court of Claims matter). The respondent failed to provide JH with a written letter of engagement or written retainer agreement for his representation in any of the above-referenced matters.
From June 27, 2019, through July 31, 2019, and in connection with the above-referenced matters, the respondent charged JH $300 per hour for legal services, and $175 per hour for his secretary's services. On October 16, 2019, the respondent increased his hourly rate for legal services from $300 to $400. The respondent applied the $400 hourly rate retroactively to work he previously had completed, thereby requesting an additional $1,330 for work he completed from June 27, 2019, through July 31, 2019.
The respondent failed to communicate to JH, in writing, the scope of his representation and the basis or rate of the fees and expenses for which she would be responsible in the traffic court matter, the criminal court matter, the Mental Health Court matter, and the Court of Claims matter.
The respondent's legal fees for his representation of JH in these matters exceeded $3,000, as follows:
a) At least $3,920 for the traffic court matter;
b) At least $9,400 for the criminal court matter;
c) At least $17,352.50 for the Mental Health Court matter; and
d) At least $21,140 for the Court of Claims matter.Based on the foregoing, charge one alleges that the respondent failed to communicate to JH, in writing, the scope of his representation and the basis or rate of the fees and expenses for which JH would be responsible, in violation of rule 1.5(b) of the Rules of Professional Conduct (22 NYCRR 1200.0). Charge two alleges that the respondent engaged in conduct prejudicial to the administration of justice by failing to provide JH a written letter of engagement or retainer agreement concerning legal representation, in violation of rules 8.4(d) of the Rules of Professional Conduct.
Charge three incorporates the factual allegations of charges one and two and further alleges that the respondent charged JH a legal fee of $400 per hour for numerous nonlegal activities, such as supervising JH's move from one storage unit to another, reviewing JH's mail, and at least 19 charges for picking up JH's mail at the post office. Furthermore, the respondent charged JH a fee of $175 per hour for secretarial services, including opening and reviewing JH's mail, for which the respondent charged JH at least 19 times.
On July 31, 2019, the respondent submitted to Small an affirmation in support of the respondent's application for payment of legal fees in the amount of $3,990 for 13.3 hours of work associated with his representation of JH. Small paid the respondent the full amount that same day.
On October 16, 2019, the respondent submitted to Small an affirmation in support of the respondent's application for payment of legal fees in the amount of $7,200 for 18 hours of work associated with his representation of JH. In his affirmation, the respondent noted an additional balance due of $1,330 because he had "erroneously billed" JH the $300 hourly rate in the July 31, 2019 affirmation, rather than the $400 hourly rate. On October 17, 2019, Small paid the full amount to the respondent.
On December 4, 2019, and January 24, 2020, the respondent submitted to Small an affirmation in support of the respondent's application for payment for 44 hours for legal work and 12 hours of secretarial work associated with his representation of JH. The respondent also claimed payment for $275.77 in postage and moving charges, and $246.92 for various bills. The total claim [*3]for payment for these two affirmations totaled $20,814.56, which Small paid in full the same day that they were submitted by the respondent.
Based upon the foregoing, charge three alleges that the respondent charged and collected excessive fees in representing a client, in violation of rule 1.5(a) of the Rules of Professional Conduct.
Charge four, incorporates allegations of charge one through three and further alleges
that on March 13, 2019, JH executed, as principal, three different powers of attorney, two entitled "statutory short form" and one entitled "statutory gift rider." In each power of attorney, JH, as principal, designated the respondent as her agent.
On April 25, 2020, the respondent, acting as "agent and attorney in fact" for JH, executed a trust agreement entitled the "[JH] Revocable Living Trust" (hereinafter the trust). The trust designated JH as the grantor and the respondent as the trustee. The respondent signed the trust agreement as trustee. The trust designated that "if no children of the Grantor survive the Grantor, then in that event the Trustee shall pay over, transfer and distribute the balance of the Trust and any undistributed income to [the respondent]." The trust further designated that "[i]n the event of the death, resignation or inability of the Trustee to act as Trustee, for any reason, then the Grantor appoints Jason Galarza to serve as Trustee." Jason Galarza is the respondent's son and had no prior affiliation with JH. JH never saw and was never read the trust agreement before it was executed.
On April 30, 2020, the respondent opened a trust account at JP Morgan Chase entitled the "[JH] Revocable Living Trust," with account number ending in 2480 (hereinafter the trust account). On or about May 1, 2020, the respondent requested that Small turn over any leftover proceeds held in Small's escrow account for JH. On May 4, 2020, the respondent deposited check no. 2679 for $110,809.18, drawn on Small's escrow account, into the trust account.
On June 2, 2020, the respondent wired $8,000 from the trust account to make a payment on his personal Lowe's credit card account. On June 12, 2020, the respondent wired $1,500 from the trust account to make a payment to his personal Home Depot credit card account. On June 25, 2020, the respondent deposited check no. 2686 for $17,667.85, drawn on Small's escrow account, into the trust account.
Between August 13, 2020, and December 15, 2020, the respondent made three payments to himself from the trust account totaling $45,330.25.
Based on the foregoing, charge four alleges that the respondent represented a client when there was a significant risk that his professional judgment on behalf of the client would be adversely affected by the respondent's own financial, business, property, or other personal interests, in violation of rule 1.7 of the Rules of Professional Conduct.
Charge five alleges that as a result of the facts and misconduct alleged in charges one through four, the respondent engaged in conduct that adversely reflects on his fitness as a lawyer, in violation to rule 8.4(h) of the Rules of Professional Conduct.
The Hearing Record
A hearing was held on January 17, 2024, continuing on January 18, 2024, and January 19, 2024. The Grievance Committee entered six exhibits into evidence to prove its case in chief. To testify as character witnesses on his behalf, the respondent called his wife, Maria Galarza. The respondent also called Joseph A. Augenanger, the Honorable Andrea Phoenix, John Sharp, Christina Chazotte, Jordan Trager, and Joseph L. Admo. The respondent also testified on his own behalf and submitted six exhibits into evidence.
The respondent testified that he is a general practitioner who handles a variety of cases including civil litigation, real estate, bankruptcy, criminal, and traffic matters. The respondent began his own practice in or about 1998 or 1999, and he has one employee who works as a secretary. The respondent stated that he previously had received grievance complaints, all of which had been dismissed except for one which resulted in a Letter of Caution in 2003.
The respondent recounted that he met JH in or around January 2019, when she came to the respondent's office seeking help for an issue she was having with the property. The purchaser was suing JH for breach of contract because she was attempting to cancel the sale. JH retained the respondent who agreed to a flat-fee retainer of $7,500 to represent JH in the breach of contract litigation regarding the property. At his examination under oath (hereinafter EUO), the respondent testified that JH "had no money to retain" him during their first meeting but that she contacted his office again. The parties had another meeting and agreed on the $7,500 flat fee, which would be paid later, presumably from the proceeds of the sale of the property.
Once retained, the respondent submitted an answer in the action for JH, conducted discovery, and appeared for a preliminary conference. During the litigation, the respondent discovered that the house on the property had been condemned by the Town of Hempstead. The respondent did not know how much time they had before the house was demolished. The respondent stated that he learned that if the Town demolished the house, the cost of the demolition would be added to the tax bill. Because JH already was delinquent in her taxes, the value of the property would be further reduced. The respondent visited the property with JH and took numerous photographs. The respondent stated that JH did not want the respondent to speak with her neighbors or anyone else without her present. The respondent stated that the house was boarded up and that he had to make arrangements with the Department of Buildings of the Town of Hempstead and receive special permission to enter the house. The respondent said the house had been declared unsafe and that JH had been living in her car in the driveway on the property. The respondent said that Nassau County had stopped JH from living in her car, but he was unaware of where JH was living when she came to him for representation.
The respondent settled the litigation surrounding the sale of the property and participated in a closing on May 15, 2019. According to the closing statement, the purchase price for the property was $240,000, an increase from the original price of $185,000, to which JH had agreed prior to the breach of contract action. The respondent stated that the new price of $240,000 was based upon his negotiations with the purchaser. From the proceeds of the sale, in addition to other disbursements related to taxes and closing fees, Small, who shared an office space with the respondent and whom the respondent engaged to act as the seller's attorney, was paid $3,500, as well as $500 for "preparation and execution of power of attorney." According to Small's bill, he was paid $3,500 for his legal services related to negotiation and drafting of the contract of sale and related closing services. Additionally, Small charged $500 for "[l]egal services related to preparation and execution of durable power of attorney related to the closing of subject premises" (emphasis added). According to the closing statement, the respondent was paid $7,500 for "Power of Attorney Preparation and Execution." The respondent signed all of the closing documents as agent for JH. Ultimately, a total of $194,132.10 was deposited into Small's escrow account from the remaining proceeds of the sale.
The respondent stated that Small served as the escrow agent for the purchase proceeds, holding the money in his escrow account. The respondent testified that JH had asked the respondent to act as power of attorney because there was no one else she could trust and she wanted the respondent to handle her affairs. The respondent explained that three power of attorney documents were executed on March 13, 2019, and that Small prepared the documents. The respondent maintained that he had "nothing to do with the power of attorney." This testimony contradicts the power of attorney documents in the record, which explicitly state, "This document was prepared by: Julio C. Galarza, Esq., 5020 Sunrise Highway, Massepequa Park, New York 11762." In further contravention, the billing records state that Small was paid only $500 for preparing the power of attorney documents, while the respondent was paid $7,500. The witness signatures on the power of attorney documents are from Brooks Taylor and the respondent's secretary, Joann Mineo. The record demonstrates that Taylor's office address is the same office address as the respondent's and that Taylor also was paid for working on the traffic court matter.
After the sale of the property, the respondent continued to perform unrelated legal work for JH at her request. No new retainer was ever signed.
From June 2019 to June 2020, the respondent billed JH for his work at a rate of $400 per hour, submitting affirmations of legal services directly to Small for payment. Although the respondent claimed that JH knew these payments were occurring, there was no testimony that JH had any say over whether Small paid the respondent the money he requested. The respondent stated that he submitted his bills directly to Small because the respondent had power of attorney.
The respondent also attended doctors' and counseling appointments with JH. The respondent stated that he accompanied JH "because she was concerned that she would go to a doctor visit and then be held against her will." The respondent billed JH for attending these appointments. For example, a billing entry from August 19, 2019, shows that the respondent billed JH for 4.3 hours, at $400 per hour, totaling $1,720, to accompany her to an appointment at Nassau University Medical center, where JH met with a psychiatrist and discussed the specific conditions from which she suffered.
In December 2019, JH was incarcerated in Nassau County Jail and then transferred [*4]to Creedmoor Psychiatric Center (hereinafter Creedmoor) approximately one week later. In a letter to Nassau County Department of Social Services, Adult Protective Services, dated December 9, 2019, the respondent wrote, inter alia, "I am writing to refer [JH] to your agency for services that I believe are necessary to protect her welfare. . . . [R]ecent developments have caused me to question her current ability to adequately care for herself and conduct herself in a rational matter."
At the end of December 2019, the respondent visited Creedmoor and spoke to a doctor who said that JH would be kept at Creedmoor for 60 days. JH was assigned an attorney from Mental Hygiene Legal Service (hereinafter MHLS) to represent her while at Creedmoor. From February 2020 until late March 2020, the respondent did not have contact with JH. The respondent testified that during this time, he thought that something had happened to JH or she had died.
In May 2020, while JH was at Creedmoor, the respondent formed a trust to manage the remainder of her money held in Small's escrow account. The respondent testified that JH "didn't say specifically that she wanted me to have a trust. What she said was, she wanted me to take care of everything. And rather than requesting every time something had to be paid, you know, an e-mail and a bill to [Small], I got the money and created a trust." The respondent stated that JH consented to the creation of the trust. The respondent testified that Small prepared the trust documents and that the respondent's 23-year-old son was named as the successor trustee. The respondent claimed that he did not know who else to appoint and acknowledged that, in hindsight, his son was not the best choice. The respondent signed the trust agreement on behalf of JH "as agent and attorney in fact" and on his own behalf as the trustee. Mineo notarized the trust documents. The respondent did not discuss the creation of the trust with JH's MHLS attorney. The trust also included a provision that if JH should pass away, the balance of the trust would be distributed to the respondent. The respondent testified that Small told the respondent that any remaining balance of the trust should be left to JH's family or a charity and Small mentioned the issue of a judicial accounting. The respondent provided the following explanation:
"So there was no one that she wanted to leave the money to, but she did indicate she wanted me to have the money. But even with that, I didn't anticipate that was—I didn't think that there would ever be money at the end of the rainbow. The other thing, too, is, if I had to do a judicial accounting, I learned that would be expensive. So my thinking was, it would be left to me, quote unquote, but it would be donated to some sort of dog charity on some level or church, for her behalf. So it was never, even though it says it would be left to me. I just didn't want to have to do a final judicial accounting and charge the money or legal fees to do that."
When asked why he created a trust and did not put the money in his escrow account, the respondent stated that he did not want to put the money into his escrow account and wanted to create a separate account. JH was not provided a copy of the trust agreement, and the respondent did not recall reading the trust agreement to JH over the telephone while she was at Creedmoor. On May 6, 2020, Small was paid $4,250 for preparing the trust documents. As of April 17, 2020, when the trust documents were drafted, the value of the trust was $113,126.33. This amount was reduced from nearly $195,000 following the closing on the property in May 2019.
At some point, JH asked the respondent to represent her instead of MHLS so that she could be released from Creedmoor. On August 11, 2020, the respondent attended a hearing on behalf of JH to secure her release. JH was released one or two days after the hearing, at which time the respondent picked up JH from Creedmoor, helped her get her car, and returned her mailbox key. The respondent testified that he told JH, "Now you can get your own mail, you can take care of your stuff, I'll still pay the bills, you just need to give them to me."
Upon JH's release from Creedmoor, the respondent gave JH the mail he had collected and the bills for which he had already been paid from the trust. According to a trust statement, in June 2020, the respondent paid himself legal fees by paying his Lowe's credit card bill in the amount of $8,000, and his Home Depot credit card bill in the amount of $1,500, directly from the trust account. On August 13, 2020, two days after the hearing at Creedmoor, the respondent paid himself $20,130.25. The respondent stated that JH did not complain about the bills and just asked the respondent to do more work. The respondent stated that he did not send a bill to JH every 60 days while she was in Creedmoor because he already was picking up her mail, he had power of attorney, and he believed it did not make sense to mail her a bill. The respondent acknowledged that from December 2019 to August 2020, while JH was at Creedmoor, he was working pursuant to the power of attorney and was paying himself accordingly.
The respondent stated that he had advanced money to himself once or twice because he was doing a lot of work for JH. On October 15, 2020, the respondent wrote a check to himself from the trust account for $18,000 in attorney's fees. The respondent explained, "[s]o like the work was done, I'd look at the—my time sheets, guesstimate hours, write a check, and then I would do a bill a week later or a couple of days later." When asked about his billing records for January 2020 through December 2020, the respondent explained that a lot of work he did for JH was not reflected in his billing records and that he performed such work as a professional courtesy. On December 15, 2020, the respondent issued a check to himself from the trust account for $7,200 in attorney's fees.
On or about April 5, 2021, the respondent's relationship with JH soured, and the respondent returned to JH the remaining money in the trust account and resigned from the trust. The respondent claimed that there was approximately $49,000 remaining in the trust account, but the actual amount was $38,423.48. The respondent provided a letter to the Grievance Committee, stating that he had uncollected bills in the amount of $7,279.43.
The respondent testified in mitigation, discussing his health concerns and personal issues which he attributed to his stress during the time of his representation of JH. The respondent suggested that the stress affected his judgment.
The Special Referee's Report
In a report dated April 8, 2024, the Special Referee sustained all fives charges of professional misconduct.
The Grievance Committee now moves to confirm the report of the Special Referee sustaining all five charges of professional misconduct, to strike paragraph 66 of the respondent's amended answer on the ground that the affirmative defenses therein do not comply with CPLR 3014 and 3018, and to impose such discipline upon the respondent as the Court deems just and proper. The Grievance Committee submits, inter alia, that the respondent has not reimbursed any of the funds to JH, that the respondent put his own financial interests above those of a vulnerable client, and that the respondent merely apologized for his misconduct without showing remorse for the clear conflict of interest. The Grievance Committee further submits that the respondent's statements in paragraph 66 of his amended answer are self-serving arguments, not in the proper form, and are not affirmative defenses as they are labeled. In his report, the Special Referee noted that the statements in paragraph 66 of the respondent's amended answer were more appropriately considered as mitigating factors.
In response, the respondent, through counsel, submits a memorandum of law in opposition, in which he asserts that only charge one of the petition should be sustained and that the remaining four charges should be dismissed, and that branch of the Grievance Committee's motion which is to strike paragraph 66 of the respondent's amended answer on the ground that the affirmative defenses therein do not comply with CPLR 3014 and 3018 should be denied as academic. The respondent contends that charges two through five fail to state a cause of action, are not supported by the evidence, and that the respondent's conduct was the result of a reasonable and well-intentioned mistake. The respondent further contends that given the mitigation presented, including that he did not act with venal intent, that he was experiencing health concerns and personal issues, that he cooperated with the Grievance Committee's investigation, that he performed pro bono work and community activities, and that JH purportedly benefitted from his services, the Court should impose a sanction no greater than an admonition or a public censure for the misconduct related to charge one. As to that branch of the Grievance Committee's motion which is to strike paragraph 66 of the respondent's amended answer on the ground that the affirmative defenses therein do not comply with CPLR 3014 and 3018, the respondent contends that the Special Referee considered these statements as mitigating factors and that the statements provide a legally cognizable justification or excuse for his actions, and are therefore proper statements.
Findings and Conclusion
In view of the evidence adduced at the hearing and the admissions, we find that the Special Referee properly sustained all five charges. The Grievance Committee's motion to confirm the Special Referee's report and to strike paragraph 66 of the respondent's amended answer on the ground that the affirmative defenses therein do not comply with CPLR 3014 and 3018 is granted.
In determining an appropriate measure of discipline, the respondent asks this Court for leniency, requesting a sanction no greater than an admonition or a public censure based upon the mitigation submitted. However, it is clear that the respondent does not appreciate the severity of his misconduct. Notwithstanding the mitigation advanced, we find that the respondent's actions [*5]necessitate the severest of sanctions. This matter involved a course of self-dealing by the respondent, who actively took financial advantage of a vulnerable individual. The respondent actively ignored his duties required by the Rules of Professional Conduct and his duty as a fiduciary to safeguard his client's limited assets.
Under the totality of the circumstances, we find that the respondent's conduct warrants disbarment from the practice of law, effective immediately (see Matter of D'Angelo, 158 AD3d 107).
LASALLE, P.J., DILLON, DUFFY, BARROS and DOWLING, JJ., concur.
ORDERED that the Grievance Committee's motion to confirm the Special Referee's report and to strike paragraph 66 of the respondent's amended answer on the ground that the affirmative defenses therein do not comply with CPLR 3014 and 3018 is granted; and it is further,
ORDERED that pursuant to Judiciary Law § 90, effective immediately, the respondent, Julio Ceasar Galarza, is disbarred, and his name is stricken from the roll of attorneys and counselors-at-law; and it is further,
ORDERED that the respondent, Julio Ceasar Galarza, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15); and it is further,
ORDERED that pursuant to Judiciary Law § 90, effective immediately, the respondent, Julio Ceasar Galarza, shall desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, Julio Ceasar Galarza, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency, and he shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Darrell M. Joseph
Clerk of the Court